## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                          )
MICHAEL GEORGE,                           )
              Plaintiff,                  )
                                          )
          v.                              )          **CIVIL ACTION**
                                          )          **NO. 13-10810-TSH**
CAROLYN W. COLVIN,                        )
Commissioner of Social Security           )
Administration,                           )
                                          )
              Defendant.                  )
_____ )


## MEMORANDUM OF DECISION ON PLAINTIFF'S MOTIONTO REVERSE
## THE DECISION OF THE SOCIAL SECURITY ADMINISTRATION (Docket No. 21)
## AND DEFENDANT'S MOTION TO AFFIRM
## THE COMMISSIONER'S DECISION (Docket No. 24)
### September 30, 2016

HILLMAN, D.J.

This is an action for judicial review of a final decision by the Commissioner of the

Social Security Administration (the "Commissioner" or "SSA") denying the application of

Michael George ("Plaintiff") for Social Security Disability Insurance Benefits and

Supplemental Security Income. Plaintiff filed a motion seeking an order reversing the decision

of  the Commissioner (Docket No. 21), and the Commissioner filed a cross-motion seeking an

order  affirming the decision of the Commissioner (Docket No. 24).[1] For the reasons set forth

below,  Plaintiff's motion is ***granted*** in part and Defendant's motion is ***denied***.

---

[1] A transcript of the Social Security Administration Official Record (*"AR."*) has been filed with the court under seal. (Docket No. 14). Citations to the AR page numbers are those assigned by the agency and appear on the lower right hand corner of each page.

**Procedural History**

Plaintiff filed an application for DIB dated October 21, 2008, claiming an alleged onset date of January 29, 2008 (AR. 277-286).  Social Security denied Plaintiff's application initially and upon reconsideration (AR. 132-133). After a hearing, an Administrative Law Judge ("ALJ") issued a decision dated August 13, 2010, finding Plaintiff not disabled (AR. 134-150). In an order dated November 16, 2010, the Decision Review Board remanded the case back to the ALJ for a new hearing (AR. 151-154). On June 3, 2011, the ALJ held a new hearing (AR. 63-92), and on June 24, 2011, issued a new decision again finding that Plaintiff was not disabled (AR. 40-62). In February 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's June 24, 2011 decision the final decision of the Commissioner (AR. 18-27). Plaintiff has exhausted his administrative remedies and this case is ripe for review under 42 U.S.C. § 405(g).

For purposes of SSI disability, a claimant must show that she had a disability which started before or during the period between the date of his SSI application (March 18,  2009) and the date of the ALJ's decision (October 27, 2011), and which lasted or was likely  to last at least twelve months.  20 C.F.R. §§ 416.202, 416.305, 416.330, 416.335.

**Background**

Plaintiff was forty-five (45) years old as of his alleged onset date (AR. 279). He had a high school education and is able to communicate in English (AR. 347). His past relevant work included jobs as an automotive service station manager, automotive service station mechanic, a parts manager, and a lead worker in construction (AR. 88).

**Medical Evidence**

Plaintiff injured his back on January 28, 2008, when he fell at work (AR. 406, 410, 415, 433). This resulted in back pain, which radiated into his legs (AR. 416, 423).

2

Plaintiff visited Dr. Leslie Mosher in January, February, and March 2008 (AR. 429-433). Dr. Mosher provided prescriptions for Vicodin and Motrin (AR. 429, 431-432). Dr. Mosher also ordered an MRI, which showed a disc herniation at L4-5 with nerve root irritation, mild spinal canal stenosis, and moderate foraminal narrowing on the right (AR. 416, 420, 423). Although Plaintiff initially stated the Vicodin was ineffective (AR. 431), he later reported that he was doing fairly well on his medications (AR. 429). Dr. Mosher provided a referral for surgical evaluation (AR. 430). Dr. Mosher stated that Plaintiff could participate in activities at home as tolerated, but that he was to remain out of work (AR. 432).

In April 2008, Dr. Patrick Connolly, a spine specialist, treated Plaintiff on April 15, 2008 and reviewed the MRI of February 23, 2008, which showed degenerative disc disease at L4-5, and a herniation at the same level with mass effect on the ventral surface of the thecal sack and spinal stenosis. (AR. 420). Dr. Connolly stated that he felt surgery was Plaintiff's best option (AR. 416). Dr. Connolly felt that there were two options: a decompressive laminectomy and discectomy, and an interbody fusion and segmental fixation (AR. 416). Dr. Connolly stated that the likelihood of Plaintiff going back to work as a laborer with the fusion and segmental fixation was close to "zero" (AR. 416). Therefore, he recommended that Plaintiff undergo the decompressive laminectomy and discectomy with rehabilitation to see if he could return to his previous job (AR. 416). Dr. Connolly opined that Plaintiff was temporarily totally disabled (AR. 417).

Plaintiff visited Dr. Mosher again in April 2008 (AR. 428). Plaintiff was seeking a second opinion as to surgery and was asking for pain medications (AR. 428). Dr. Mosher provided a prescription for Vicodin (AR. 428).

Dr. Robert B. Swotinsky, MD, examined Plaintiff on July 18, 2008.  He opined, "I

reviewed MRI film report which is suggestive of possible nerve impingement at L5 on R.

Exam is consistent w/this." (AR. 423). In addition to an MRI, Dr. Swotinsky made other

findings including back and leg pain at 45 degree left and right, decreased pinprick sensation

on right calf, and reduced strength with extension of the right leg at the knee. *Id.* Plaintiff told

Dr. Swotinsky at this visit that his worker's compensation insurance would not pay for

surgery. *Id.* Plaintiff wanted narcotic pain medication to treat the pain. *Id*. Dr. Swotinsky

prescribed Vicodin with no refills *Id.* Plaintiff later requested more narcotic pain medications,

which were not provided Id. Plaintiff indicated that he was upset about not being able to get

more medication (AR. 426).

In November 2008, Plaintiff told the Agency that he lived alone in an apartment (AR.

349). Although he had trouble performing tasks that involved bending, such as putting on his

shoes and socks, putting clothes in the dryer, and cooking in the oven, he was generally able to

care for himself and perform chores such as simple cooking, vacuuming, folding laundry, and

washing dishes (AR. 349-351). He cared for two cats and tried to go on walks (AR. 349-350). He

went shopping weekly (AR. 352). He was able to drive and manage his finances (AR. 352). He

did not need reminders to do things (AR. 351, 353). He read and watched television, although he

reported he could not sit for long (AR. 353). He stated he could walk for 40 yards (AR. 354). He

could pay attention for as long as he was comfortable and followed spoken instructions very well

(AR. 354).

He stated he had once been fired for refusing to sell just for the sake of a sale, but said he

got along with authority figures very well, that he socialized, and that he got along with others

(AR. 354-355). He said he handled stress pretty well and that he handled changes in routine

fairly well (AR. 355). He said he used a cane, but acknowledged it was not prescribed (AR.

355).

On January 5, 2009, Dr. Erik Purins completed a physical RFC assessment on behalf of the Agency (AR. 437-444). Dr. Purins concluded that Plaintiff could lift up to 20 pounds occasionally and up to 10 pounds frequently, that he could stand and/or walk for at least two hours in an eight- hour workday, and sit for about six hours in an eight-hour workday (AR. 438). He also concluded that Plaintiff had an unlimited ability to push and pull (AR. 438). Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl (AR. 438). He had no additional limitations other than the need to avoid concentrated exposure to extreme cold and heat and hazards (AR.438-441).

A second MRI was performed on January 1, 2009 that showed loss of disc height at L3-4 with a disc bulge into the epidural space and at L4-5 a large central paramedian disc protrusion that effaces the epidural space and caused deformity of the thecal sac, Spinal Stenosis, and disc bulging. (AR. 736).

On January 12, 2009, Plaintiff visited Dr. Debra Twehous, complaining of back and leg pain from his work injury (AR. 488). Plaintiff described his pain as ranging from a 4-8/10, with numbness and weakness in his right leg (AR. 488). He stated his pain was worse with activity, prolonged standing, sitting, and walking (AR. 488). Plaintiff stated he had experienced a couple of instances where his right leg collapsed (AR. 488). He reported that his pain interfered with his daily activities, sleep, and mood (AR. 488). He had not had physical therapy and had declined surgery and injection therapy (AR. 488). Upon examination, Plaintiff had tenderness in his spine and a limited range of motion (AR. 489). He also had increased pain with extreme hip and knee flexion on the right (AR. 489). His leg strength was 5/5, however (AR. 489). He ambulated with a normal gait and was able to heel and toe walk (AR. 489).

Plaintiff saw Dr. Twehous again on March 2, 2009 (AR. 481). Dr. Twehous noted that an MRI had shown lumbar spondylosis as well as a moderately large disk protrusion at L4-5, resulting in mild central stenosis (AR. 481). Plaintiff reported not liking Tramadol, but that he was doing better with Vicodin for pain relief (AR. 481). He reported some difficulty initiating his urinary stream, but was pleased with the pain management (AR. 481). Dr. Twehous recommended a trial of physical therapy (AR. 481).

Plaintiff visited Dr. Twehous on April 14, 2009 (AR. 476). Plaintiff had started physical therapy and stated he felt he could walk farther and was more flexible (AR. 476). His pain was a 7/10 (AR. 476). He continued to take Vicodin and reported no new side effects (AR. 476). Upon examination, he showed some tenderness in his lower lumbar spine upon palpation (AR. 476). He complained of increased pain with lumbar extension, but overall his range of motion was within functional limits (AR. 476). His right leg strength was 4/5 compared with his left (AR. 476).

A May 28, 2009 discharge note from physical therapy indicates that Plaintiff had partially met his goals, with unresolved mild radicular symptoms (AR. 517). He was managing his daily activities with increased ease and had a good prognosis (AR. 517).

In an undated letter, which Dr. Twehous appears to have written after January 18, 2009, she stated that Plaintiff had reached maximum medical improvement (AR. 505). She stated she did not do a formal disability evaluation, and with regard to permanent work restrictions, she recommended that Plaintiff undergo a functional capacity evaluation (AR. 505). In another undated letter, Dr. Twehous again stated that she had not done a formal disability evaluation and that it would be best for him to undergo a functional capacity evaluation to determine his work restrictions (AR. 506).

Dr. Twehous summarized her treatment of Plaintiff in a letter of May 19, 2009 and stated that she could not comment on Plaintiff's disability status at that time (AR. 504). She did not feel that Plaintiff was at maximum medical improvement (AR. 504). She recommended continued physical therapy and stated he might benefit from epidural steroid injections (AR. 504). Dr. Twehous also stated he might require a functional capacity evaluation to determine appropriate work restrictions (AR. 504).

Plaintiff saw Dr. Twehous again on June 18, 2009 (AR. 471). Plaintiff had completed physical therapy and reported that overall, it had significantly improved his right leg symptoms (AR. 471). His pain that day was 6/10 (AR. 471). He was taking Vicodin up to six times per day and stated he was not interested in injections (AR. 471). Upon examination, Plaintiff had right lower lumbar hypersensitivity to light touch (AR. 471). He also had pain with lumbar extension, but his leg strength was good bilaterally (AR. 471). Dr. Twehous gave Plaintiff a prescription for Lidoderm patches and a home exercise program (AR. 471).

On October 13, 2009, Plaintiff saw Dr. Twehous in follow-up (AR. 464). Plaintiff stated he was not interested in trigger point or epidural steroid injections because he had a phobia of needles (AR. 464). Plaintiff complained of an increased spasm in his right, lower back, and stated his pain was a 6/10 (AR. 464). He said his pain was mostly in his right, lower lumbar area radiating into his buttock and down the right leg (AR. 464). He reported two episodes of his right knee giving out (AR. 464). Plaintiff reported that he had been unable to return to work, but that he was able to do his home exercise program, which included stretching and walking (AR. 464). He remained on Lidoderm patches and Vicodin, with no newly reported side effects (AR. 464). Plaintiff stated he was becoming depressed due to his ongoing pain and inability to settle his worker's compensation case (AR. 464). Upon examination, he had hypertonicity of the right

7

lumbar para-spinal muscles and increased pain with lumbar extension and right side bend (AR. 464). His low back and buttock pain increased during a stretching exercise (AR. 464). Strength was 5/5 in his left leg and 4/5 in his right (AR. 464). Dr. Twehous prescribed Selaxin for Plaintiff's muscle spasm (AR. 465). She also started him on a trial of Wellbutrin for depression (AR. 465).

Plaintiff saw Dr. Twehous again on December 14, 2009 (AR. 456). Plaintiff stated he had been doing fairly well on his pain regimen until December 8, when he reinjured his back shoveling snow (AR. 456). He was having radicular symptoms in his right buttock and leg, and reported his pain as a 9/10 (AR. 456). Upon examination, Plaintiff had a positive flip test in his right leg (AR. 456). There was hypertonicity of his lumbar para-spinal muscles and his trunk was shifted (AR. 456). There was some weakness in his right leg (AR. 456).

On February 9, 2010, Plaintiff saw Dr. Twehous in follow-up (AR. 450). Plaintiff reported improvement in his pain and his depression (AR. 450). His pain was a 7/10 (AR. 450). He still had some radicular symptoms in his right leg (AR. 450). He was able to do his daily home exercise program (AR. 450). Upon examination, he had lumbar hypertonicity with tenderness to palpation of the lower lumbar spine and para-spinals muscles (AR. 450). Neurontin was added to his pain regimen (AR. 450).

On April 1, 2010, Dr. Twehous wrote a letter stating that she had not done a formal disability evaluation, so could not comment on his disability status (AR. 659). She again stated that it would be best for Plaintiff to undergo a functional capacity evaluation (AR. 659).

On July 27, 2010, Plaintiff visited Dr. Twehous (AR. 650). Plaintiff reported that he did not have significant improvement with physical therapy (AR. 650). His pain was 7/10 in his lower back with radiation into his right leg (AR. 650). He experienced weakness in his right leg,

with his right knee giving out (AR. 650). Upon examination, his trunk was shifted to the left, there was significant lumbar hypertonicity on the right with local tenderness to palpation (AR. 650). He complained of pain with range of motion in all planes (AR. 650). There was weakness in the right EHL (AR. 650).

Plaintiff saw Dr. Twehous on November 30, 2010 (AR. 633). He complained of low back pain radiating into his right leg at a level of 8/10 (AR. 633). Plaintiff had right lumbar hypertonicity and tenderness (AR. 633). His lumbar range of motion was restricted in all planes, and he had some weakness in his right hip flexors (AR. 633). Plaintiff was doing an exercise program that included a flexibility program, and aerobics program, and a core strengthening program (AR. 633).

On February 15, 2011, Plaintiff visited Dr. Twehous (AR. 619). Plaintiff had an exacerbation of his back pain when he bent over to pick up some cokes (AR. 619). Plaintiff had tried Oxycodone, which Dr. Twehous had recently prescribed, but it did not really work better than Vicodin (AR. 619). His pain was 8/10 (AR. 619). He was given a trial of MS Contin (AR. 619).

Plaintiff visited Dr. Twehous on April 12, 2011 (AR. 604). He continued to complain of low back pain radiating into his right leg, with weakness in his right leg and falls (AR. 604). He described his pain as an 8/10 (AR. 604). Plaintiff reported that an acquaintance was stealing his medications (AR. 604). Plaintiff displayed lumbar hypertonicity and pain with lumbar extension, and there was weakness in his right leg (AR. 604). Dr. Twehous recommended restarting physical therapy (AR. 604).

Plaintiff saw Dr. Twehous again on May 24, 2011 (AR. 595). Plaintiff complained of back pain of 10/10, radiating into his right leg (AR. 595). Dr. Twehous noted that Plaintiff had

not followed her recommendation to resume physical therapy due to transportation issues (AR. 595). He continued to decline steroid injections (AR. 595). Upon examination, he had lower lumbar tenderness and spasm (AR. 595). He had a restricted range of motion and diffuse weakness in his right leg (AR. 595).

On May 24, 2011, Dr. Twehous completed a physical RFC questionnaire (AR. 577-580). Dr. Twehous indicated that she had seen Plaintiff initially on January 12, 2009, and saw him every two to four months (AR. 577). She listed his diagnoses, described his symptoms, and stated that his prognosis was poor (AR. 577). She did indicate that physical therapy had been helpful (AR. 577).

She opined that his impairments had lasted, or could be expected to last, at least 12 consecutive months (AR.577). She offered that depression affected his physical condition (AR. 577). Dr. Twehous opined that Plaintiff's symptoms were severe enough to interfere with the ability to perform even simple tasks frequently (AR. 578). She was unsure about his ability to tolerate work stress and his ability to walk city blocks (AR. 578). She offered that Plaintiff could sit for 15 minutes at one time, but was unsure how long he could stand at one time, or how long he could sit, stand, and/or walk total in an eight-hour workday (AR. 578). She opined that he needed to be able to walk around every 15 minutes for two minutes (AR. 578). She additionally opined that he would need a job with a sit/stand option and that he would need to take unscheduled breaks (AR. 579). He did not need an assistive device to stand or walk occasionally (AR. 579). Dr. Twehous opined that Plaintiff could frequently lift up to 10 pounds, occasionally lift up to 20 pounds, and rarely lift up to 50 pounds (AR. 579). He could move his head around frequently, could occasionally climb stairs, and could rarely twist, stoop, and crouch (AR. 579). He could never climb ladders (AR. 579). He had no significant limitations in reaching, handling,

or fingering (AR. 580). He would have good and bad days (AR. 580). Dr. Twehous was unsure

how many days per week Plaintiff would miss from work (AR. 580).

Standard of Review for the Commissioner

To receive SSDI and SSI benefits, Plaintiff must show she has a "disability," defined in

this context as an "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or

has lasted or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 404.1505(a). The inability must be severe,

rendering the claimant unable to perform any previous work or any other substantial gainful

activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505.

To determine disability, the ALJ evaluates the claimant's application utilizing the

following five-step analysis:

> 1) if the applicant is engaged in substantial gainful work activity, the application is
> denied; 2) if the applicant does not have, or has not had within the relevant time
> period, a severe impairment or combination of impairments, the application is
> denied; 3) if the impairment meets the conditions for one of the "listed"
> impairments in the  Social Security regulations, then the application is granted; 4) if
> the applicant's  "residual functional capacity" is such that he or she can still
> perform past relevant  work, then the application is denied; [and] 5) if the applicant,
> given his or her residual  functional capacity, education, work experience, and age,
> is unable to do any other  work, the application is granted.

*Seavey v. Barnhart*, 276 F.3d 1, 5 (1ˢᵗ Cir. 2001).  It is the applicant's burden to show at Step

4  that s/he is not able to do past relevant work as the result of a "significant limitation;" if the

claimant meets his/her burden, "the Commissioner then has the burden at Step 5 of coming

forward with evidence of specific jobs in the national economy that the applicant can still

perform." *Id.*; *see also* 42 U.S.C. 423(d)(5)(A) ("An individual shall not be considered to be

under a disability unless he furnishes such medical and other evidence of the existence thereof

as   the [ALJ] may require."). It should also be noted that "[a]ll five steps are not applied to

every applicant, as the determination may be concluded at any step along the process."

*Seavey*, 276  F.3d at 5.

Standard of Review for Court Review of Commissioner's Decision

Pursuant to the Act, this Court may affirm, modify or reverse the Commissioner's

final   decision, with or without remanding the case for rehearing.  42 U.S.C. § 405(g).  This

Court   reviews the Commissioner's final decision to determine whether: (i) the correct legal

standard   was applied, and (ii) the decision was supported by substantial evidence.  *Seavey*,

276 F.3d at 9;  *see also* 42 U.S.C. § 405(g).  While the Court's review of questions of law is

*de novo,* the Court  defers to the Commissioner's findings of fact, so long as they are

supported by substantial  evidence.  *Seavey*, 276 F.3d at 9-10.  Substantial evidence is that

which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971); *see also Ortiz v. Sec'y of Health & Human Servs.,* 955

F.2d 765, 769 (1st Cir. 1991) (even if administrative record could support multiple

conclusions a court must uphold Commissioner's  findings "if a reasonable mind, reviewing

the evidence in the record as a whole, could accept it as  adequate to support his

conclusion.")

In applying the "substantial evidence" standard, the Court must bear in mind that it is

the province of the ALJ, not the Court, to find facts, decide issues of credibility, draw

inferences from the record, and resolve conflicts in the evidence. *Ortiz*, 955 F.2d at 769.

Ultimately, the Court may affirm, modify, or reverse the Commissioner's decision, with or

without remanding the cause for a rehearing, 42 U.S.C § 405(g), but reversal is warranted

only if the ALJ committed a legal or factual error in evaluating a claim or if the record

12

contains no "evidence rationally adequate…. to justify the conclusion." *Roman-Roman v. Comm'r of Soc. Sec.*, 114. Fed. App'x. 410, (1st Cir. 2004); see also *Manso-Pizarro v. Sec'y of Health and Human Services*, 76 F. 3d. 15 (1st Cir. 1996).

<u>The ALJ's Findings and Decision</u>

A claimant's entitlement to SSDI and SSI turns on whether he has a "disability," which is defined in this context as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S .C. §§ 416(i), 423(d)(1)(A); 20 C.F.R. § 404.1505. The inability must be severe, rendering the claimant unable to do any of his previous work or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–1511.

The Commissioner uses a five-step evaluation process to determine whether an applicant meets this standard. 20 C.F.R. § 404.1520 (a)(4).  At step one, the Commissioner decides whether the applicant is engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520 (a)(4)(i). If not, the Commissioner proceeds to step two. Step two requires the Commissioner to determine whether the applicant's impairment is "severe." 20 C.F.R. § 404.1520 (a)(4)(ii). If the claimant establishes that the impairment is severe, the Commissioner proceeds to step three and determines whether the impairment meets or equals one of the listings in the Listing of Impairments, 20 C.F.R. § 404, subpart P, Appendix 1. 20 C.F.R. § 404.1520 (a)(4)(iii). If so, the claimant is conclusively presumed to be disabled. *See Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S.Ct. 2287 (1987). If not, the Commissioner proceeds to step four. Step four asks whether the applicant's residual functional capacity (RFC) allows her

to perform her past relevant work. 20 C.F.R. § 404.1520 (a)(4)(iv). If the claimant is capable of performing past relevant work, he or she is not disabled. If the claimant is unable to perform past relevant work, the burden shifts to the Commissioner on the fifth step to prove that the claimant "is able to perform other work in the national economy in view of [the claimant's] age, education, and work experience." *Bowen*, 482 U.S. at 142. If the Commissioner fails to meet this burden, the claimant is disabled and is entitled to benefits. *Id.*

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 29, 2008, the alleged onset date (AR. 46). At step two, the ALJ found that Plaintiff suffered from the severe impairments of back pain due to degenerative disc disease and depressive disorder (AR. 46). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listing (AR. 46). The ALJ went on to find that Plaintiff retained the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b), except he was limited to performing work that involved standing and walking only two hours in an eight-hour work day; allowed for the option to sit and stand at will; involved no more than occasional climbing of ramps and stairs, stooping, crawling, crouching, and kneeling; involved simple and unskilled tasks; required no overhead lifting or reaching; no operation of right leg and foot controls; was not performed at heights or on ladders; did not use ropes or scaffolding; and involved no more than incidental exposure to extremes of cold, vibration, or dangerous moving machinery (AR. 48). At step four, the ALJ found that Plaintiff's RFC would not allow him to return to his past relevant work (AR. 57). The ALJ then found, in light of Plaintiff's age, RFC, education, and work experience, and based on testimony by a vocational expert ("VE"), that Plaintiff would be able to perform other work existing in significant numbers in the national economy (AR. 57-58). Accordingly, the ALJ found that Plaintiff was not disabled (AR. 58).

14

Plaintiff raises four arguments: 1) that that the ALJ did not properly consider Plaintiff's testimony regarding his symptoms; 2) that the ALJ did not properly assess the medical evidence; 3) that the ALJ failed to incorporate Plaintiff's mental impairments into his finding on the scope of Plaintiff's RFC; and 4) that the hypothetical question presented to the vocational expert did failed to incorporate all of his limitations.

## Discussion

Because it is dispositive of matter, the Court will first deal with Plaintiff's second argument, that the ALJ did not properly weight the opinion evidence of the treating physicians. The term "treating physician" is defined in the regulations as any physician who "has provided [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502; 20 C.F.R. § 416.902. When the treating source's opinion is well-supported by medical evidence, the Social Security Administration's regulations instruct an administrative law judge to give it controlling weight. 20 C.F.R. § 404.1527(c)(2); 20 C.F.R. § 416.927(c)(2).

Plaintiff first argues that in determining Plaintiff's RFC, the ALJ improperly weighed the medical opinions of Plaintiff's treating sources and the non-examining state agency consultants. An ALJ must "always consider the medical opinions in [the] case record," 20 C.F.R. §§ 404.1527(b); 416.927(b), and SSA regulations prioritize the opinions of a claimant's treating sources. *See* 20 C.F.R. §§ 404.1527(c)(1); 416.927(c)(1) (stating that "[g]enerally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you"). The treating source rule provides that the ALJ should give "more weight" to the opinions of treating physicians because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical

impairment(s) and may bring a unique perspective to the medical evidence that cannot be

obtained from the objective medical findings alone or from reports of individual examinations."

20 C.F.R. § 404.1527(c)(2); 416.927(c)(2). Controlling weight will be given to a treating

physician's opinion on the nature and severity of a claimant's impairments if the opinion "is

well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence" in the record. *Id*.

   In certain circumstances, however, the ALJ does not have to give a treating physician's

opinion controlling weight. *Arroyo v. Sec'y of Health & Human Servs.*, 932 F.2d 82, 89 (1st

Cir. 1991) (observing that "[t]he law in this circuit does not require ALJs to give greater weight

to the opinions of treating physicians"). The regulations allow the ALJ to discount the weight

given to a treating source opinion where it is inconsistent with other substantial evidence in the

record, including treatment notes and evaluations by examining and non-examining physicians.

*Arruda v. Barnhart*, 314 F. Supp. 2d 52, 72 (D. Mass. 2004); 20 C.F.R. § 404.1527(c)(2)-(4);

416.927(c)(2)-(4); *see also* SSR 96-2p, 1996 WL 374188, at *2. Where controlling weight is

not given to a treating source opinion, the ALJ considers an array of factors to determine what

weight to grant the opinion, including the length of the treatment relationship and the frequency

of examination, the nature and extent of the treatment relationship, the degree to which the

opinion can be supported by relevant evidence, and the consistency of the opinion with the

record as a whole. *See* 20 C.F.R. § 404.1527(c)(2)-(6); 416.927(c)(2)-(6). Further, the

regulations require adjudicators to explain the weight given to a treating source opinion and the

reasons supporting that decision. *See* 20 C.F.R. § 404.1527(c)(2); 416.927(c)(2) ("We will

always give good reasons in our notice of determination or decision for the weight we give

your treating source's opinion."). The ALJ is required, however, to provide "good reasons" for

deciding to give the treating source's opinion the weight he did and must state "specific reasons for the weight given to the treating source's medical opinion ... and must be sufficiently specific to make [it] clear to any subsequent reviewers[.]" SSR 96-2p, 1996 WL 374188, at *5;

Here, the ALJ gave little weight to the opinion of Dr. Twehous, Plaintiff's treating physician, and Plaintiff argues that the ALJ failed to provide sufficient reasoning to justify such a discount. In support, Plaintiff argues that the ALJ improperly discounted Dr. Twehouse's opinion because he believed that she acted out of sympathy towards Plaintiff in rendering her medical opinion. Second, Plaintiff argues that, contrary to the ALJ's findings, Dr. Twehouse's opinion is not inconsistent with her own analysis or the record as a whole.

This court has consistently stated that commentary by an administrative law judge which speculates that "health care providers are sometimes inclined to assist patients in applications for disability benefits out of sympathy—[is] unnecessary and unhelpful to the determination of disability." *Hill v. Astrue,* 2012 WL 5830707, at *4, (D.Mass. Nov.12, 2012); *see also Gonzalez v. Astrue,* 2012 WL 2914453, at *3 (D.Mass. July 5, 2012). An administrative law judge's concerns about motive are only appropriate when supported by evidence. *See Rodriguez,* 694 F.Supp.2d 36, 43 (2010). Here, the ALJ suggested that Dr. Twohous's opinion was based on sympathetic motives and stated it would explain why the opinion was inconsistent with the record. Specifically, the ALJ wrote:

> The possibility always exists that a doctor may express an opinion in an effort to assist a patient with who he or she sympathizes for one reason or another. Another reality that should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are all more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the present case.

(A.R. at 55)

The ALJ did not, however, refer to any specific evidence indicating that Dr. Twehous's opinion was anything but her honest assessment of Plaintiff's limitations. Standing alone, this is not a permissible basis on which to discount a treating physician's opinion. As the First Circuit has directed, it is improper to discount a treating source's opinion simply because it was solicited. *See Gonzalez Perez v. Secretary of Health & Human Services,* 812 F.2d 747, 749 (1st Cir.1987) ("[s]omething more substantive than just the timing and impetus of medical reports obtained after a claim is filed must support an ALJ's decision to discredit them."). Likewise, this court has admonished administrative law judges in the past for questioning the motivations of a treating physician in issuing a report. *See, e.g., Rodriguez v. Astrue,* 694 F.Supp.2d 36, 43 (D.Mass. 2010); *see also, Gonzalez v. Astrue*, 2012 WL 2914453 (D. Mass 2012).

Dr. Twehous saw Plaintiff more frequently than any other doctor, and Dr. Twehous is the only doctor who treated Plaintiff for his back pain over any significant period of time. His notes form the bulk of the medical evidence. Further, the Court notes that the ALJ did not refer to any specific evidence—and the Court is not aware of any on record—that indicates that Dr. Twehous's opinion was anything but her honest assessment of Plaintiff's limitations. Given the lack of a more specific explanation that would support the ALJ's suspicion of Dr. Twehous's motives, the court finds this reason for discounting the opinion unsupported and speculative and, hence, improper. SSR 96-2p, 1996 WL 374188, at *5.

The ALJ went on to reason that Dr. Twehous's RFC was inconsistent with the record evidence, which "revealed an ability to partake in many activities of daily living despite allegedly disabling symptoms," (AR. 55), referring not to Plaintiff's testimony at the most recent 2011 hearing, but to his Function Report dated 2008. To support these contentions, the ALJ briefly lists as reasoning for granting "little weight to the opinion of Dr. Twehous," that fact that

Plaintiff's condition had briefly improved following physical therapy and the fact that Plaintiff did not need the use of a cane. (AR. 55).

What remains is a discounted treating physician's opinion without valid justification for the discount. The ALJ's speculation as to the motives behind Dr. Twehous's medical opinion is not supported by facts and the ALJ improperly determined that Dr. Twehous's opinion was inconsistent with the record. As a result, the ALJ failed to provide sufficient grounds for not giving Dr. Proctor's opinion, as the treating physician, controlling weight. Accordingly, it is necessary to remand the matter for a further hearing. *See Seavey v. Barhart,* 276 F.3d 1, 12 (1st Cir. 2001) ("When an agency has not considered all relevant factors in taking action, or has provided insufficient explanation for its action, the reviewing court ordinarily should remand the case to the agency."). It is recommended that the hearing be held following an updated functional capacity evaluation of the Plaintiff.

### Conclusion

For the reasons set forth above, Defendant's Motion for Order Affirming the Commissioner's Decision (Docket No. 24) is ***denied***, and Plaintiff's Motion For Order Reversing the Decision of the Commissioner (Docket No. 21) is ***granted***, only to the extent that it seeks a remand.


**SO ORDERED**.

/s/ *Timothy S. Hillman*

Timothy S. Hillman

United States District Judge